IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Civil No. 8:19CV304 |
| vs. | |
| $41,940.00 IN UNITED STATES CURRENCY, | **COMPLAINT FOR FORFEITURE *IN REM*** |
| Defendant. | |

The United States of America, for its cause of action against the defendant property,

pursuant to Rule G(2) of the Supplemental Rules for Admiralty and Maritime Claims and Asset

Forfeiture Actions, states and alleges as follows:

**Nature of the Action**

1.   This is an action to forfeit property to the United States for violations of 21 U.S.C.

§ 881.

**The Defendant *In Rem***

2.   Law enforcement seized $41,940.00 U.S. currency from Matthew Petersen and Andrew

Asgeirsson on February 22, 2019, during a traffic stop on Interstate 80 near mile marker 391, in

Lancaster County, Nebraska.

3.   The U.S. Customs and Border Protection (CBP) currently has custody of the defendant

property in Minneapolis, Minnesota.

**Jurisdiction and Venue**

4.  This Court has subject matter jurisdiction over an action commenced by the United States pursuant to 28 U.S.C. § 1345, and over an action for forfeiture pursuant tor 28 U.S.C. § 1355(a). This Court also has jurisdiction over this particular action pursuant to 21 U.S.C. § 881.

5.  This Court has *in rem* jurisdiction over the defendant property pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this district.

6.  Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this district.

**Basis for the Forfeiture**

7.  The defendant property is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it constitutes 1) money, negotiable instruments, securities and other things of value furnished or intended to be furnished in exchange for a controlled substance in violation of the Controlled Substances Act, 2) proceeds traceable to such an exchange, or 3) money, negotiable instruments and securities used and intended to be used to facilitate a violation of the Controlled Substances Act.

**The Stop, Search and Seizure**

8.  On February 22, 2019, Lancaster County Sheriff's Deputy Jason Henkel saw a red Hyundai with New Jersey license plates traveling westbound on Interstate 80 and following another vehicle too closely.

9.  Deputy Henkel timed the distance between the vehicles and discovered that the Hyundai was following at a distance of .96 seconds.

10. Following another vehicle at .96 seconds is not reasonable or prudent.

2

11. Deputy Henkel saw that as the Hyundai continued westbound, its speed increased and appeared to be traveling over the posted speed limit of 75 mph.

12. Deputy Henkel used radar to detect that the vehicle was traveling 86 mph.

13. Deputy Henkel conducted a traffic stop of the vehicle near mile marker 391, outside of Lincoln, Nebraska.

14. Deputy Henkel approached the vehicle and spoke to the driver, Matthew Peterson, and the passenger, Andrew Asgeirsson.

15. As he began talking to Peterson and Asgeirsson, Deputy Henkel noted a moderate odor of marijuana coming from within the Hyundai.

16. Deputy Henkel told Petersen that the reason he stopped him was for speeding and following too closely, and explained that he would issue him a warning.

17. Deputy Henkel requested the driver's driver license and saw that it was a New York driver license.

18. Deputy Henkel also requested the rental agreement for the Hyundai.

19. Deputy Henkel noticed that both the driver and passenger we displaying nervous behaviors, including trembling hands. The driver had labored breathing and Deputy Henkel could see a carotid pulse in the side of the driver's neck and his heart beat in his chest. The passenger had trembling hands, a visible pulse on the side of his neck and labored breathing.

20. Deputy Henkel asked Peterson accompany him back to his patrol car for him to write the warning. Peterson agreed and was seated in the passenger seat of Deputy Henkel's patrol car.

3

21. In the patrol car, Deputy Henkel talked with Peterson about his travel plans and asked Peterson where they were going. Peterson said they were going to Oregon, explaining that the passenger, Asgeirsson, lived in Oregon.

22. Peterson also said that Asgeirsson was looking to buy property in southern Oregon, of over 100 acres, near Medford.

23. Peterson claimed he was accompanying Asgeirsson to look at machinery that was included in the land purchase agreement.

24. Petersen said that Asgeirsson had flown from Oregon to New York the day before.

25. Petersen said he planned to fly back to New York and that Asgeirsson would stay in Oregon.

26. Deputy Henkel commented that it was a long flight and a long drive back and Peterson agreed.

27. Deputy Henkel asked Peterson what he does for a living and Peterson said he was an electrician, one year away from a license.

28. Deputy Henkel asked Peterson if they were going to drive straight through and Peterson said, "we'll see."

29. The rental car agreement showed that Petersen and Asgeirsson had picked up the car the day before (February 21) in New York and that they were due to return it in Oregon on the day of the traffic stop (February 22).

30. Petersen claimed that he was excited to see America during the drive, but admitted that they had not made any stops to see any tourist attractions, although they might stop in San Francisco.

4

31. Deputy Henkel noticed that as Peterson talked about his travel plans, his level of nervousness began to increase even more, including trembling hands, a visible pulse in his neck and chest, and labored breathing.

32. Meanwhile, Sergeant Jason Mayo arrived and approached the passenger side of the vehicle, where he noticed that Asgeirsson was using his cell phone and continued to type on the phone as Sergeant Mayo knocked on the window and briefly spoke with Asgeirsson.

33. Sergeant Mayo saw that Asgeirsson was very nervous based on his answers, facial expressions, and shaky hand movements.

34. Sergeant Mayo asked Asgeirsson for the vehicle registration. Asgeirsson hesitated, then opened the glove box to retrieve it, allowing Mayo to see inside the Hyundai and see a clear, vacuum-sealed bag, a bottle of liquid that appeared to be cough syrup, and an off-white cylindrical tube consistent with the type that holds marijuana blunts distributed from dispensaries.

35. In Deputy Henkel's patrol car, Deputy Henkel began to discuss Peterson's work as an electrician. Deputy Henkel explained that his father was an electrician, and that Henkel himself did some electrical work after high school.

36. Peterson said he had been working as an electrician for 10 years, but said he was still one year away from getting his license.

37. Henkel questioned Peterson about such a long time as an apprentice because usually it takes four to five years to become a journeyman. Peterson explained he had been working on and off with school.

38. Based on his training and experience, Deputy Henkel believed that both Petersen and Asgeirsson were involved in criminal activity, specifically the transportation of drug money.

39. Deputy Henkel asked Peterson about any personal use marijuana in the vehicle, and Peterson admitted there was some, but said he had not smoked any that day.

40. Deputy Henkel asked Peterson if there were any other illegal narcotics in the vehicle and Peterson denied possession of any other illegal narcotics.

41. Deputy Henkel then asked Peterson if there were any large amounts of U.S. currency in the vehicle.  Peterson at first said no, but then asked "U.S. currency?" paused, and then admitted that the passenger may have some currency in the center console, but denied it was more than $25,000.

42. Deputy Henkel asked Peterson permission to search the vehicle.

43. Peterson responded, "I'd rather you not sir."

44. Deputy Henkel explained to Peterson that he had probable cause to search the vehicle and asked what the passenger (Asgeirsson) did for a living.

45. Peterson paused, scratched his head and said, "I'm not sure to be honest with you."

46. Deputy Henkel asked Peterson how long he had known him and Peterson said he had known him for a long time, and that he thought he was, "essentially investing in land."

47. Deputy Henkel told Peterson that he believed that Peterson and the passenger had large amounts of currency and personal use marijuana was in the vehicle, and explained the multitude of reasons that cause him to have this belief.

48. Peterson commented, "I understand that deduction . . . I'm actually deducing that myself."

49. Deputy Henkel exited the patrol car, returned to the rented Hyundai, approached Asgeirsson, and asked him to step outside of the rental vehicle.

50. Deputy Henkel informed Asgeirsson that the officers were going to search the vehicle.

51. Asgeirsson admitted to having approximately $40,000 of U.S. currency in the trunk.

52. Asgeirsson provided Deputy Henkel with a key to a locked Pelican case in the trunk.

53. Deputy Henkel escorted Asgeirsson back to Officer John Hudec's patrol car and then retrieved Petersen from Henkel's patrol car.

54. Petersen said he had approximately $1,000 on his person.

55. Henkel then escorted Petersen to the backseat of Officer Hudec's patrol car.

56. Sergeant Mayo began the probable cause search by opening and looking in the front passenger door where he found a piece of vacuum sealed bag on the front floorboard, along with THC cough syrup, and a THC vape cartridge.

57. As Sergeant Mayo continued to search the front occupant area of the vehicle, Deputy Henkel searched the trunk and found a locked Pelican briefcase.

58. The keys that Asgeirsson gave to Deputy Henkel opened the lock revealing a large amount of U.S. currency in the case. The currency was bundled in rubber bands, folded in half, marked with attached sticky notes, and concealed in a plastic bag. **Exhibit 1**, Pictures of currency, attached hereto. It was bundled in a manner that Deputy Henkel saw in the past for proceeds of narcotics distribution. In addition, the denominations were consistent with that of narcotic sales. The bundling and denominations were not consistent with cash from a bank

7

withdrawal. Moreover, the currency had the odor of marijuana, leading Deputy Henkel to conclude that the currency was proceeds from the sale of marijuana.

59. Deputy Henkel field tested the currency with a Mistral Drug Detection test that indicated positive for cannabis.

60. The search of the main area of the Hyundai revealed a dispensary container holding 2.2 grams of marijuana, THC cannabis syrup, two THC vape cartridges, a clear bag with marijuana residue and odor, and an empty marijuana dispensary tube, bundles of U.S. currency giving off the odor of marijuana in the center console.

61. In the back seat of the Hyundai, Sergeant Mayo located trimming scissors, a cut top from a vacuum sealed bag, paperwork showing property in Ashland, Oregon, and notes showing marijuana grow site preparation and the amount of marijuana that could be grown on site. **Exhibit 2**, Handwritten Notes, attached hereto.

62. Officers seized Petersen's iPhone 5 with a cracked screen and Asgeirsson's iPhone 6.

63. Officer Hudec returned to his patrol car and advised both Peterson and Asgeirsson of their Miranda rights.

64. Both Peterson and Asgeirsson agreed to waive their rights and to talk to the officers.

65. Deputy Henkel and Officer Hudec questioned Asgeirsson in Officer Hudec's patrol car. At various points, Asgeirsson claimed that he flew to New York to close his Wells Fargo bank account, which he claimed he could not do at a Wells Fargo branch in California or Oregon; and that the cash was a tax-free gift that had been withdrawn from a bank and that he intended to use the money to purchase property in Oregon.

66. Asgeirsson later said that the cash was his "life savings" that he had for many years.

8

67. Officer Hudec told Asgeirsson that law enforcement has a currency counter that will photograph each bill and the serial number and would be able to go back and determine where these bills were disseminated from and the year.

68. Asgeirsson then changed his story again, claiming that he took some of the money out of his "life savings" and replaced it with other bills.

69. Petersen abandoned the currency on the day of the traffic stop, by signing a Notice of Abandonment and Assent to Forfeiture of Prohibited or Seized Merchandise.

70. LCSO later obtained a search warrant for Petersen's iPhone 5 and a search warrant for Asgeirsson's iPhone 6.

71. An analysis of Asgeirsson's iPhone 6 revealed numerous chats that pertained to the sale and distribution of marijuana and THC products; text messages consistent with visiting a marijuana grow, obtaining cash from a house, dispersing multiple pounds of marijuana and cash to numerous people, and picking up items and selling marijuana and THC products; and, videos of marijuana plants inside a residence, buds of marijuana, THC cartridges, and cannabinol syrup.

72. LCSO concluded that the information on Asgeirsson's iPhone 6 indicates that Asgeirsson is heavily involved in the manufacture, sale, and distribution of marijuana.

73. On April 12, 2019, CBP received a template claim form (available at www.forfeiture.gov), from Nebraska attorney Jason Troia on behalf of Asgeir Asgeirsson, who claimed that he is the father of Andrew Asgeirsson.

**Claims for Relief**
**First Claim for Relief**

74.     The United States repeats and incorporates by reference paragraphs 1 through 73 above.

75.     Property is subject to forfeiture pursuant to 2l U.S.C. § 881(a)(6), which provides for the forfeiture of:

> All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter.

76.     By the foregoing and other acts, the defendant property constitutes moneys, negotiable instruments, securities or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. § 801, *et seq*., and therefore, is forfeited to the United States pursuant to 21 U.S.C. § 881(a)(6).

77.     By the foregoing and other acts, the defendant property constitutes proceeds traceable to an exchange for a controlled substance or a listed chemical in violation of 21 U.S.C. § 801, *et seq*., and therefore, is forfeited to the United States pursuant to 21 U.S.C. § 881(a)(6).

78.     By the foregoing and other acts, the defendant property constitutes securities used or intended to be used to facilitate a violation of 21 U.S.C. § 801, *et seq*., and therefore, is forfeited to the United States pursuant to 21 U.S.C. § 881(a)(6).

## Second Claim for Relief

79.     The United States repeats and incorporates by reference paragraphs 1 through 73 above.

80.     Proceeds or property derived from any specifically enumerated offense, as well as any "specified unlawful activity," (as defined in 18 U.S.C. § 1956(c)(7)) are subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(l)(C).

81.     The definition of a specified unlawful activity incorporates the definitions contained in 18 U.S.C. § 1961(1)(D), thereby making it a specified unlawful activity to engage in "the felonious manufacture, importation. receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical. . . ."

82.     By the foregoing and other acts, the defendant property constitutes proceeds or property derived from "the felonious manufacture, importation. receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical. . . ." in violation of 18 U.S.C. § 1961(1)(D), and therefore, is forfeited to the United States pursuant to 18 U.S.C. § 981(a)(l)(C).

WHEREFORE the United States of America prays the defendant property be proceeded against for forfeiture in accordance with the laws, regulations and rules of this Court; that due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed; that the defendant property be condemned, as forfeited, to the United States of America and disposed of according to law and regulations; that the costs of this action be assessed against the defendant property; and for such other and further relief as this Court may deem just and equitable.

11

UNITED STATES OF AMERICA,
Plaintiff

JOSEPH P. KELLY
United States Attorney

By:     *s/ Amy B. Blackburn*

Amy B. Blackburn (MO#48222)
Assistant U.S. Attorney
1620 Dodge Street, Suite 1400
Omaha, NE 68102-1506
Tel: (402) 661-3700
Fax: (402) 345-5724
E-mail: amy.blackburn@usdoj.gov

12

## **VERIFICATION**

I, Andrew Vincik hereby verify and declare under penalty of perjury that I am a Special Agent Homeland Security Investigations (HSI) that I have read the foregoing Verified Complaint *in Rem* and know the contents thereof, and that the factual matters contained in paragraphs 8 through 82 of the Verified Complaint are true to my own knowledge, except that those matters herein stated to be alleged on information and belief and as to those matters I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Special Agent with Homeland Security Investigations (HSI).

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Dated July 10, 2019

Andrew Vincik
Special Agent
Homeland Security Investigations (HSI)

13



GOVERNMENT
EXHIBIT

1

**1. Medical Marijuana Card**
Ashland Alternative Health
180 Clear Creek Dr. #103
Ashland, Oregon 97520
Tel: 541·488·2202

Cost: $200 a card

Grow Site Registration: $200
— Made with credit or debit card.

**2. Genetics / Clones**
24 Plants + Hophouse
12 Seed Starts -12 clones
· HSCo? South Fork Seeds
· Scooby Snacks
· Dosido
· Sherpet
· SouthFork Kush (seed start)

GOVERNMENT
EXHIBIT

**2**

0106

Clone Room
- CF23
- Racks for the trays
- Watering Can
- Cheap comprehensive Sal) nutrient
- Fans going
- VPD needs to be optimal

Natural Farming Method
Study + Implement FPJ
IMO and LAB

# 2019 Wealth Plan

Overview:
Our goal is to build enough capital in this calendar year to fund the establishment of a profitable cannabis brand, a coffee stand, and the infrastructure necessary to do both.

We want to accrue no debts in the process of doing so. We want to aim for zero-waste, in all regards. No plastic waste, no runoff & no harmful chews/pesticides and no wasted time.

"Grass Roots Operation"

Steps for 2019 Cannabis:
1. Purchase land / living space
2. Set up outdoor space (Deadline May 25)
   - 48 Pots / Raised Beds
   - Fencing
   - Irrigation
   - Fertilizers + Nutrients
   - Clone Propagation
   - Purchase Trellis / Cages
   - Generator
   - IPM Protocol
   - Clean Spaces to prevent Pests

0108

3. Planting/Veg Phase
 - Weekly Feed Schedule for employees
 - Weekly Spray Schedule
 - Training/Skirting
 - Set up trellis/cages
 - Compost tea 1-3 times monthly
 - Make Clones of everything before flower

4. Flower Phase
 - Schedule Adjustments/✗ Flush ✗
 - Clean up insides Preventing Popcorn/pests
 - P+K Salts
 - Bloom Teas
 - Final Flush
 - Leaf the biggest
 - Prepare shop for drying

5. Harvest
- Check trichomes once daily on fields
- ~~Chop of~~ Flush Flush Flush
- Only chop what you are willing to hang that day
- Plant → Tote → Dry Room
- Dry room @ 65°C 35-45% RH
- Cure in turkey bags burped twice daily 1 hour each in front of fans
- Organize Trim Schedules + Trim Team
- Extra Harvest Help may be needed

Goals for 2019 Harvest
- Avg. 2-3 lbs per plant
- Make enough to build greenhouses for following year
- Try to avoid Salts, use ferments

0110

2·11·19                    timbertax.org
                   • Land should maybe be held
                     under cooperation
                   • IRS does not require formal
                     Book keeping

## Forest Plan:

The property located @ 11457 HWY 66
has a considerable amount
of marketable timber. The timber
can be harvested for profit.
Before we begin getting our hopes
up the necessary measures are
as follows

1) Property needs to be walked
w/ homeowner and basic
info needs to be collected
   - When last harvest?
   - Logging Roads?
   - Did they use a specific
     forester and/or logbuyer?
   - What was details of
     last planting?

2) Consultant needs to be
hired to determine value,
aka a cruise of the land
   - Forestry Student, Forester,
   Logging Contractor, Forestry
   Consultant

3) Establish Forest Management
Plan + Contract w/ Purchaser
   - Harvest, Planting, Log Buyer,
   access roads

0111

www.oregonloggers.org

Forest Plan Cont'd
- Forest Landowners Guide to the Federal Income Tax
- Taxes must be filed correctly
  - IRS does not require formal Bookkeeping
- Land can be titled under a corporation or it can be an investment
  - Maybe benefits to holding under LLC ?
- Real estate estimated profit not taxed, sale proceeds can qualify as capital gain AKA tax free self employment tax free
- Individuals + corporations can deduct tax property tax
- Expenses can be deducted as well
  - Purchase of land
  - Buildings + Machinery w/ useful more than 1 year
- Examples
- When purchasing land, separate the FMV of Land, Buildings, Young Growth, + Merchantable Timber
  - This is called "Cost Basis"
- Labor + equipment costs for management can be capitalized
- 10K year deductible

0112